RECEIVED
FEB 09 2001
U. S. DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA
DEPUTY CLERK

U.S. DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA
FILED FEB 13 2001

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

NORMAN BROWN, TYRONE CLOFER, ROBERT COOPER, JOHN DANIELS, KENNETH EDWARDS, BRIAN JOHNS, MICKEY LANERIE, EARL LOWE, JONAH MENARD, DENNIS TAYLOR, MICHAEL WARDLAW, GREGORY WIMBERLY,

CIVIL ACTION NO. 957-D-M2

VERSUS

SECRETARY RICHARD STALDER, WARDEN BURL CAIN, ASST. WARDEN BARNETT, DAVID BONNETT, JOE LEE, DWAYNE MCFATTER, HOWARD PRINCE, DONALD BARR, DOUG DURRETT, PAUL PERKINS, DARRYL VANNOY, JIMMY JOHNSON, DARRYL BORDELON, MAJOR BRANSTUDER, CAPT. LAMARTINIERE, CAPT. NETTLES, CAPT. GARNER, CAPT. HUGHES, CAPT. CHAD OUBRE, LT. COCKERHAM, LT. FOSTER, LT. DAVID ROSS, LT. PORET, LT. GUNN, COL. FONTENOT, COL. JAMES BUTLER, COL. STEWART, UNKNOWN NAMES OF SECURITY OFFICERS, OTHER UNKNOWN MEMBERS OF THE TACTICAL TEAM, E.M.T GEORGE DAUZAT, E.M.T. GREEN, MARY ANTHONY, LESLIE DUPONT, AND GENA LEWIS

**CIVIL RIGHTS SUIT FOR DAMAGES, INJUNCTIVE RELIEF**
**and**
**DEMAND FOR JURY TRIAL**
**(Amended)**

## INTRODUCTION

The Plaintiffs are inmates at the Louisiana State Penitentiary in Angola, Louisiana, who bring this civil rights complaint asking for compensatory damages, punitive damages, injunctive relief and a demand for a jury trial.

On the night of December 28, 1999, the Plaintiffs were in "call-out" at Camp "D" Education Building. On that night they and two security guards were taken hostage by several inmates who

INITIALS KL DOCKET# 9

CN

inmate who succeeded in escaping from the building. The prison's tactical team was called into the building to quash the attempted take over. After one of the "take-over" inmates was killed, another injured, and the rest under control, the team searched the building. Plaintiffs and two security guards were found in three rooms, the AA/NA meeting room, the band room, and the inmate law class office. The inmates were lying face-down on the floor, hands behind their heads, the security guards were bound. The tactical team, infuriated by the brutal killing of their fellow officer, turned on the inmate hostages lying on the floor. In a frenzied, out of control and vicious attack, they turned their revenge into a nine-hour nightmare for the Plaintiffs. The team was joined by numerous assistant wardens and security guards shortly after the initial storming of the building. Some of the guards had alcohol on their breath. Secretary of State Richard Stalder and the Warden of Louisiana State Penitentiary, Burl Cain, were also present in the Education Building of Camp D. They both witnessed the torture of the hostage inmates and although stopped it momentarily, did nothing to insure the inmates, the torture they were receiving, would not resume once they left the building. Plaintiffs seek both compensatory and punitive damages for the use of outrageously excessive force used maliciously and sadistically against them. A force that has caused them to suffer severe physical and emotional damages. They seek injunctive relief from this Court ordering the State and/or the Department of Public Safety and Corrections to promulgate procedures and safeguards that would require some authority outside of the prison system to supervise, and if necessary, intervene in the initial restoration of order in a prison uprising. Procedures of law, that would control the behavior of any and all prison personnel, using unnecessary and wanton treatment against hostage inmates. Procedures of law that which would restrain unnecessary and malicious force to regain control of the aggressors themselves also. Plaintiffs also seek redress for their deprivation of due process. Plaintiffs were charged with "threat to security", tried by the very persons who beat and tortured

them, and found guilty. They were sentenced to indefinite administrative segregation. They lost 180 days of good time, their jobs and privileges were taken away, their property lost or destroyed. They spent months in administrative lock down, some are still there. For over a month they were left bare- footed on a concrete floored cell in January before they were given prison slides to wear. Plaintiffs seek injunctive relief for the restoration of their good time; for an order mandating the Department of Corrections to promulgate a rule by which inmates are to conduct themselves in a hostage take-over situation; they seek injunctive relief in an order mandating that the Department of Corrections set aside all disciplinary measures taken against every inmate who was disciplined for "threat to security" that were taken hostage or escaped from the building before being taken hostage; that they be restored the privileges and jobs they enjoyed before December 28,1999, that their property be returned, replaced or money paid for replacement; compensatory damages for the losses they suffered as a result of the due process violations; for their sufferings for the extended lock down, for depriving them of their right of access to the courts; for their lack of medical care; Plaintiffs further bring related state causes of action under this Court's pendent jurisdiction. Finally, Plaintiffs seek attorney fees and costs pursuant to 42 U.S.C.1988 and demand for a jury trial.

**JURISDICTION AND VENUE**

Jurisdiction is founded on 28 U.S.C. 1331, as well as the court's pendent jurisdiction.

Plaintiffs are United States citizens incarcerated in Angola, Louisiana at the Louisiana State Penitentiary.

Each Plaintiff has "exhausted" his Administrative Remedies and Disciplinary Appeals through the failure of the Department of Corrections to answer their appeals and grievances. All time delays have run for the Department of Public Safety and Corrections to respond.

Defendants were employed by the Louisiana State Department of Corrections and Public Safety at all times relevant to this suit.

## PARTIES

**PLAINTIFFS:**

1. Norman Brown
2. Tyrone Clofer
3. John Daniels
4. Kenneth Edwards
5. Brian Johns
6. Mickey Lanerie
7. Earl Lowe
8. Jonah Menard
9. Dennis Taylor
10. Michael Wardlaw
11. Gregory Wimberly
12. Robert Cooper

All of the above Plaintiffs are inmates at Louisiana State Penitentiary, located in Angola Louisiana.

**DEFENDANTS:**

1. Defendant Richard Stalder is the Secretary of the Department of Corrections and was present in the Education Building as the top decision maker of the prison on the night of

December 28, 1999, and witnessed and condoned by his inaction the guards' behavior and state of mind.

2. Warden Burl Cain, as warden of the penitentiary, was present in the Education Building when the tactical team and other security guards used excessive force on the Plaintiffs and was cognizant of the state of mind of his guards and their actions. With knowledge of this, he did nothing to insure the mistreatment of the Plaintiffs would cease.

3. David Bonnett, adult citizen of the United States at all times relevant hereto, was employed by the Dept. of Corrections and participated in the excessive force against the Plaintiffs and their deprivations of rights.

4. Doug Durrett, adult citizen of the United States at all times relevant hereto, was employed by the Dept. of Corrections and participated in the excessive force against the Plaintiffs and their deprivations of rights.

5. Paul Perkins, adult citizen of the United States at all times relevant hereto, was employed by the Dept. of Corrections and participated in the excessive force against the Plaintiffs and their deprivations of rights.

6. Darryl Vannoy, adult citizen of the United States at all times relevant hereto, was employed by the Dept. of Corrections and participated in the excessive force against the Plaintiffs and their deprivations of rights.

7. Jimmy Johnson, adult citizen of the United States, at all times relevant hereto, was employed by the Dept. of Corrections and participated in the excessive force against the Plaintiffs and their deprivations of rights.

8. Col. Stewart, adult citizen of the United States, at all times relevant hereto, was employed by the Dept. of Corrections and participated in the excessive force against the Plaintiffs

and their deprivations of rights.

9. Col. Fontenot, adult citizen of the United States, at all times relevant hereto, was employed by the Dept. of Corrections and participated in the excessive force against the Plaintiffs and their deprivations of rights.

10. Darryl Bordelon, adult citizen of the United States, at all times relevant hereto, was employed by the Dept. of Corrections and participated in the excessive force against the Plaintiffs and their deprivations of rights.

11. Major Branstuder, adult citizen of the United States, employed by the Dept. of Corrections and participated in the excessive force against the Plaintiffs and their deprivations of rights.

12. Capt. Lamartiniere- adult citizen of the United States, at all times relevant hereto was employed by the Dept. of Corrections and participated in the excessive force against the Plaintiffs and their deprivations of rights.

13. Capt. Nettles, adult citizen of the United States, at all times relevant hereto, was employed by the Dept. of Corrections and participated in the excessive force against the Plaintiffs and their deprivations of rights.

14. Capt. Garner, adult citizen of the United States, at all times relevant hereto, was employed by the Dept. of Corrections and participated in the excessive force against the Plaintiffs and their deprivations of rights.

15. Capt. Chad Oubre, adult citizen of the United States, at all times relevant hereto, was employed by the Dept. of Corrections and participated in the excessive force against the Plaintiffs and their deprivations of rights.

16. Lt. Cockerham, adult citizen of the United States, at all times relevant hereto, was

employed by the Dept. of Corrections and participated in the excessive force against the Plaintiffs and their deprivations of rights.

17. Lt. Foster- adult citizen of the United States, at all times relevant hereto, was employed by the Dept. of Corrections and participated in the excessive force against the Plaintiffs and their deprivations of rights.

18. Lt. David Ross, adult citizen of the United States, at all times relevant hereto, was employed by the Dept. of Corrections and participated in the excessive force against the Plaintiffs and their deprivations of rights.

19. Lt. Gunn, adult citizen of the United States, at all times relevant hereto, was employed by the Dept. of Corrections and participated in the excessive force against the Plaintiffs and their deprivations of rights.

20. Unknown names of Security Officers, adult citizens of the United States, at all times relevant hereto, was employed by the Dept. of Corrections and who took part in the beatings and mistreatment of the Plaintiffs.

21. Other Unknown Members of the Tactical Team not already named as Defendants, adult citizens of the United States, at all times relevant hereto, was employed by the Dept. of Corrections who were present the night of the December 28, 1999, and who beat the Plaintiffs without restraint, wantonly, sadistically and without reason, who repeatedly threaten Plaintiffs' lives by putting a gun to their heads and telling them they were going to get their heads blown off, and for other vicious and inhumane acts that damaged the Plaintiffs emotionally and physically.

22. Captain Hughes, adult citizen of the United States, at all times relevant hereto, was employed by the Dept. of Corrections and was in Camp "C" where the inmates were taken after the beatings He also hit and attempted to strangle one of the inmates before locking him in the cell, as

well as hitting others with a baton. He participated in leaving Plaintiffs naked in their cell with no heat and a bare mattress and leaving the Plaintiffs bare-footed without shoes or slippers to stand on a concrete floor for more than a month.

23. E.M.T. George Dauzat, adult citizen of the United States, at all times relevant hereto, was employed by the Dept. of Corrections and who refused to give medical treatment to the injured Plaintiffs after they suffered injuries.

24. E.M.T. Green, adult citizen of the United States, at all times relevant hereto, was employed by the Dept. of Corrections and who refused to give medical treatment to the injured Plaintiffs after they suffered injuries.

25. Col. James Butler, adult citizen of the United States, at all times relevant hereto, was employed by the Dept. of Corrections and participated in the excessive force against the Plaintiffs and their deprivations of rights.

26. Lt. Poret, adult citizen of the United States, at all times relevant hereto, was employed by the Dept. of Corrections and participated in the excessive force against the Plaintiffs and their deprivations of rights.

27. Asst. Warden Barnett, adult citizen of the United States, at all times relevant hereto, was employed by the Dept. of Corrections and participated in the excessive force against the Plaintiffs and their deprivations of rights.

28. Joe Lee, adult citizen of the United States, at all times relevant hereto, was employed by the Dept. of Corrections and participated in the excessive force against the Plaintiffs and their deprivations of rights.

29. Warden Howard Prince, adult citizen of the United States, at all times relevant hereto, was employed by the Dept. of Corrections and participated in the excessive force against the

Plaintiffs and their deprivations of rights.

30. Donald Barr, adult citizen of the United States, at all times relevant hereto, was employed by the Dept. of Corrections and participated in the excessive force against the Plaintiffs and their deprivations of rights.

31. Dwayne McFatter, adult citizen of the United States, at all times relevant hereto, was employed by the Dept. of Corrections and participated in the excessive force against the Plaintiffs and their deprivations of rights.

32. Mary Anthony, adult citizen of the United States, at all times relevant hereto, was employed by the Dept. of Corrections and participated in the excessive force against the Plaintiffs and their deprivations of rights.

33. Leslie Dupont, adult citizen of the United States, at all times relevant hereto, was employed by the Dept. of Corrections and participated in the excessive force against the Plaintiffs and their deprivations of rights.

34. Gena Lewis, adult citizen of the United States, at all times relevant hereto, was employed by the Dept. of Corrections and participated in the excessive force against the Plaintiffs and their deprivations of rights.

## CAUSE OF ACTION

35. At all times relevant to this suit, all the individual defendants were acting under color of state law.

36. On the night of December 28, 1999, at about 8:30 p.m., the Plaintiffs were in various rooms of the Education Building in the Louisiana State Penitentiary. They were all on "call out"

attending their activity for the night.

37. Plaintiffs: Tyrone Clofer, Kenneth Edwards, Mickey Lanerie, Earl Lowe and Michael Wardlaw were in the band room practicing on their musical instruments.

38. At some point, an inmate the Plaintiffs only knew as "Foots" interrupted their band practice. He informed the Plaintiffs that he and other inmates had taken Capt. Knapp hostage and that Capt. Knapp might be dead. He also told the Plaintiffs that the band members could leave but that they may get shot doing so because there were snipers all around the building.

39. The Plaintiffs in the band room, were afraid to run from the building and afraid of the inmates who had taken Capt. Knapp hostage. When "Foots" left the room, they decided to barricade themselves in the band room so that when the security officers came, the officers would see that the band members had not been a part of the take over.

40. Sometime later, the Plaintiffs heard shouting and kicking at the door. They removed the file cabinet and speakers that they had used to bar the door. When they saw that it was the Tactical team, they tried to tell them that they were hostages too and that they had nothing to do with the take-over or the attacking of security guards or taking hostages.

41. The tactical team rushed into the room, shouting profanities, brandishing high-powered rifles, yelling, "Get on the floor!" The team tied the hands and feet of Plaintiffs unmercifully tight with "flex-cuffs", hands behind their backs and feet tied crossed at the ankles. The Tactical team then begin to kick and beat the Plaintiffs, dragging them up by their handcuffs, stripping them of their shoes, belts, and clothing and dragging them into the hall.

42. Plaintiffs Norman Brown, John Daniels, Jonah Menard, and Brian Johns, had been in the AA/NA meeting room along with two other inmates, Henry Hadwin and Donald Williamson. While they were watching a movie, an inmate known then to the Plaintiffs as "New York, came into

the AA room with blood spattered on his clothes and a screwdriver in his hand. He was dragging a lieutenant into the room. The lieutenant was handcuffed. He turned to the Plaintiffs and told them not to move. He then turned to another inmate, Barry Edge, and told Edge not to let any inmate out of the room. Moments later, " New York", came back with the Sgt. Walker. He sat her down in a chair. The inmates tried to keep the lieutenant warm after finding out that he had a medical problem. They tried to comfort the female sargent who began to cry from fright. Then inmate "New York" came back into the room and told the inmates that it would be over soon and then took Sgt. Walker out of the room. Then another inmate from Falcon Unit opened the door and informed the inmates that Captain Knapp was dead. He told the inmates to get into a corner because there were guards on the roof. The inmates moved their chairs in the corner of the room. Then the inmate from Falcon Unit came back into the room and told them that people from outside was about to come into the building and told them they should lie down on the floor. The Plaintiffs waited in dread expectation. Finally, after hearing shots, a loud commotion in the hall, the Tactical team of the prison busted into the AA/NA meeting room . The Tactical team found the Plaintiffs face down on the floor, with their hands on the back of their heads. The Team kicked, punched, struck with the Plaintiffs with the back of rifles, held rifles to their heads, and knocked the Plaintiffs around. Captain Bonnett hit every member in the room in various places on their body daring them to look into his face and see his stripes, telling them to remember his face so they could tell what he did to them. Each of the Plaintiffs was dragged into the hall.

43. Gregory Wimberly was in the room for law class studies. At the command of one of the Captors, he and his fellow inmates remained in the room with the door bolted. When the Tactical team came to the door of the paralegal office, the security guards began to kick at the door and one of the members of the paralegal team let them in. The inmates tried to explain that they had

nothing to do with whatever had gone on in the building but the officers beat and kicked them, handcuffed their hands behind their back and tied their ankles. Gregory Wimberly was then drug into the hall.

After the Plaintiffs were drug into the hallway they were made to kneel with their heads against the wall, still handcuffed and feet crossed and cuffed behind them, an excruciating position to kneel in. They were ordered not to look up. If they fell over they were beaten and punched. The officers beat and punch them and they never knew where the next punch or kick would come from. They were hit with sticks and shouted at. Some were told they would be shot in the head if they looked away from the wall. The security guards would randomly pick someone lined up against the wall and yell a question at him. If the inmate dared to answer, he would be beaten for talking. If the inmate refused to answer, they would be beaten for not answering an officer. If they fell over from exhaustion, they were punched and beaten and made to get back on the wall.

44. Sometime after the hallway torture began, the Plaintiffs were taken one by one to a medical team and their nails examined to see if there were blood under them. They were photographed and questioned. They were asked if they were hurt but no matter what the answer was, the EMT refused any medical attention they needed. They were stripped, photographed and given a jumpsuit to put on but before each could fasten it, they were handcuffed and tied at the ankles again and left with the suit gapping open from neck to pubic area.

45. The beating and shouting and threatening to kill them went on and on for hours and hours. The inmates were not allowed to use the bathroom or talk. Some of them held the urge to urinate for a long, long time and finally urinated on themselves. They were beaten even more for doing that. Some Plaintiffs were so frightened that they defecated on themselves. The officers ridiculed and laughed at them for doing so.

46. Secretary Richard Stalder and Warden Burl Cain were both in the building when the beatings were going on and actually observed the inmates being tortured. They ordered the beatings to stop and the tactical team members were ordered to "stand down" and to remove all guns from the building. The guns were replaced with sticks. Neither Secretary Stalder nor Warden Cain took measures to insure that the beatings would stop. They left the building and the inmates in the hands of the men that both Stalder and Cain knew or should have known would continue to beat and torture the inmates.

The defendant security guards named in this suit all took part in the beating and torture of the inmates, whether in the Education building, during transportation to Camp "C", or during the housing of the inmates in Camp "C". Some were responsible for the continued lockdown of the Plaintiffs without evidence of any wrongdoing and full knowledge that the Plaintiffs were hostages and victims themselves in the entire event.

47. Plaintiffs flex-cuffs were taken off their wrists and ankles and told to strip and put on white jumpsuits. Before they could fasten any button however, they were re-handcuffed with the flex-cuff and shackled. The cuffs were brutally tightened and many of the inmates have scars from plastic cutting into their wrists. They were pushed and shoved into the hall where they were made to wait to be transported. The weather was in the low 30's. The inmates were not allowed to fasten the jumpsuits that gapped open from the neck to the pubic area. They had no coats and no shoes. They were marched out in single line and told to keep "d--- to ass" and no space better be seen between any of them because they would beat them. All the way from the Education Building to the bus that would transport them, they were beaten with sticks in the head, the ribs, knees, and hips.

48. Once on the bus that transported them, Plaintiffs were terrorized with threats of being killed. They were repeatedly told that it was their night to die and that they should already

have been killed. The officers walked up and down the aisle of the bus striking randomly at the inmates screaming that it was their night to die.

49. When the Plaintiffs reached Camp "C", they were drug and thrown off the bus. They were continually beaten and their lives were threatened .

50. When the Plaintiffs arrived at Camp "C", they were stripped of their jumpsuits and placed naked in the cells. In spite of temperatures in the low 30's, there was no heat . The windows were opened. They were given no cover or sheets for the mattresses. It was not until the change of shift that the officer in charge, who found the Plaintiffs naked and shivering in the bitter cold cells, closed the windows, turned on the heat, and gave them clothing.

51. At about 6:00 a.m. of December 29, 1999, the Plaintiffs were taken to the Education Building. Plaintiffs were required to line up, barefoot outside the building. One by one they were taken into the building and questioned. Each waited his turn, some were made to wait as long as an hour in the freezing cold in jump suits with short sleeves.

CLAIMS OF NORMAN BROWN

52. Norman Brown suffered the same atrocities as the other Plaintiffs described herein. He was also beaten on his head, face, neck, chest, back, arms, legs, and even in the groin. He had damage to his teeth causing him to lose a tooth and to have oral surgery. He has suffered internal bleeding since the night of the beatings and torture, but the doctors that attend him do not know its source. He suffered and still suffers pains in his legs and knees, he has problems with lower back -in November 2000, he was unable to turn over in bed because of lower back pain and hips. He too, suffered the cold on the concrete floor, months and months of lockdown. His wrists were swollen due to the flex cuffs cutting into them, the swelling of his wrists lasted over a week. His knees were

swollen for a couple of weeks, his neck was bruised and an old whip-lash injury was aggravated, his outer and upper legs were blackened from bruises and were swollen for about a month, he still has a lump in his left leg from a blow received. Norman Brown continues to suffer emotionally. He continues to have nightmares of he and other inmates being shot and killed, he gets frightened when he sees more than two or three guards together near him, especially if these guards are known to be on the tactical team. He seeks compensatory and punitive damages as well as injunctive relief.

CLAIMS OF TYRONE CLOFER

53. Tyrone Clofer submits that he suffered all of the atrocities described by the preceding paragraphs and additionally, was brought into the "C" building for questioning the morning of the 29th of December. When he got inside, Asst. Warden David Bonnette punched him in the face then stood on Plaintiff's foot and asked, "What the f---- are you looking at?" Then Col. Kenny Fontenot grabbed Tyrone Clofer's testicles and squeezed them and stated that, he had in mind cutting them off and shoving them down Plaintiff's throat. Tyrone Clofer was locked in Administrative Segregation for a total of fifty-eight days and forty of those were without shoes, forced barefoot on the concrete floor in January and February. He was then moved to a working cell block where he remained for months. During the night of terror, various defendants pointed revolvers, automatic pistols and shotguns at Tyrone Clofer. Some actually threatened to shoot and kill Tyrone Clofer. He was struck in the head with the butt of a shotgun while being threatened to be shot to death. He has suffered emotional trauma. He is depressed and is presently undergoing evaluation for the depression. He seeks compensatory and punitive damages as well as injunctive relief.

CLAIMS OF ROBERT COOPER:

54. Robert Cooper, was also in the AA Class in the Education Building when he heard keys falling to the floor. When he looked outside the door, he saw inmates attacking Capt. Knapp. He slammed the door and stayed awhile in the class room but suddenly took his chances and fled the AA Class room. On the way out of the building, the hostile inmates tried to stop Robert Cooper, as well as others in the legal class room, from leaving the building. Plaintiff Cooper managed to escape from the building. He and other inmates tried to get a security guard they saw coming out an adjoining building to help Capt. Knapp, but the guard ran away. Plaintiff Cooper then climbed the fence to the Sally Port and reported what was happening. In spite of reporting the incident as it was happening, Robert Cooper was punished with the other Plaintiffs for threat to security because he allegedly knew what was going to happen and did not report it to security. Robert Cooper had no previous knowledge of what was going to happen, nor did the Disciplinary Board have any evidence that he did. He was sentenced to extended lockdown for having knowledge of the plot to kill Captain Knapp.

While at Camp D, Hawk, after petitioner filed his ARP , he was called to the bars by Col. Bordelon while he was in Administrative Segregation. When he went to the bars, Col. Bordelon handcuffed and shackled Plaintiff to the bars. Bordelon then said, " You little nigger, bitch, you want to file an A.R.P. on me?' ' Capt Bordelon then attacked Plaintiff with blows to his body causing him great pain and contusions, then drug him out of the cell and continued to beat him. When he was returned to his cell, all of his copies of the ARP complaint and the Disciplinary Appeal, writing paper, stamps, were taken from the cell, thereby depriving Plaintiff of his right of access to the Court. Every time Plaintiff requested to call his family, he was refused. Plaintiff never received any answer to his ARP nor his Disciplinary Appeal. Plaintiff continues to be in Administrative Segregation even though

there has been absolutely no evidence that he was involved in the inmate take-over. Plaintiff Cooper has suffered physically from the beatings he received at the hands of Capt. Bordelon. He has also suffered the mental anguish of being held in Administrative Lockdown for almost a year without any proof or reason to hold him further. He seeks compensatory and punitive damages as well as injunctive relief.

CLAIMS OF KENNETH EDWARDS

55. Kenneth Edwards was beaten so badly with a "billy club" that his face swelled to such a degree that he was barely recognizable. His face felt numb. His back, neck and chest were bruised, and one of his eyes were blood red from where he was kicked in the eye by Asst. Warden Barnett. One of his fingers was broken. His wrists were severely bruised and cut.

That night he was taken to the hospital but beaten walking to the van that would transport him. When Doctor Barnes examined him, he said he didn't need stitches but took an x-ray of his hand. He suffered for several weeks after the beating. He has recovered with no physical pains presently. Emotionally, he still suffers from the experience. He seeks compensatory and punitive damages as well as injunctive relief.

CLAIMS OF MICKY LANERIE

56. Mickey Lanerie was beaten by several different Defendants while on his knees during the four hours in the hall, while loading the bus to Camp "C", while running to Tiger Unit. He was punched by Capt. J. Hewes and slapped in the face. He was kicked, punched, hit with sticks in the head and in the eye, causing it to blacken. He suffered contusions on the right side of his head, bruised chest, ribs, back, arms, legs, thighs, calves & chin. He was struck by Maj. Bruanschroeder on the back with a billy club. He was also struck by Col. Lamartiniere. Sgt. Chad Oubre struck him with a clipboard. Pictures were taken of him in the nude. He was so frightened

for his life by the constant threats and beatings that he defecated on himself three times during the night. He continues to suffer emotionally from these experiences. He seeks compensatory and punitive damages as well as injunctive relief.

CLAIMS OF DENNIS TAYLOR

57. Dennis Taylor had been a class "A" trustee for 23 years. He was in the legal program for 6 years and was in fact in the legal class room when the Tactical team busted into the room. He was beaten and kicked by the Tactical team. A shotgun was used to knock him in the head. A lump formed on his forehead and stayed there for a few days. He was beaten while on his knees for hours in the same contorted position as described above.. He was beaten with fist, clubs, back of guns, on his head , back, legs, arms, chest, knees. He was spat on, and his life was threatened. He was bruised throughout his body. His wrists and ankles were bloody from the flex-cuffs. He attempted to see the EMT several times after the beatings and was refused.. He suffers emotionally to this day from his treatment. Nightmares plaque him. He seeks compensatory and punitive damages as well as injunctive relief.

CLAIMS OF JONAH MENARD

58. Jonah Menard was beaten severely in the head , eyes and ears. He has suffered ear problems since the night of the beatings. His vision continues to be blurry and has had frequent headaches. He suffered bruises on his head, face, back, arms, wrists, ankles and thighs. His wrists and legs had deep cuts because of the flex cuffs being applied so tightly. He was spat upon, slapped, and his life threatened. He was beaten with batons in the hall, en route to Camp "C" and on the bus to camp "C". He suffered physically from his injuries and also mentally and continues to suffer emotional trauma from the experience. He seeks compensatory and punitive damages as well as injunctive relief.

CLAIMS OF BRIAN JOHNS

59. Brian Johns suffered the same atrocities as his fellow inmates in the AA room. He was slammed into a wall by Captain Bonnett. His eye was closed from swelling for three weeks. His wrists cut and swollen from flex-cuffs for over a week. His knees were bruised and swollen for several weeks. His outer and upper legs were blackened from bruises and swollen for a month. He still has a lump in his left leg. His neck was bruised. An old whip lash injury was aggravated by the blows he received to the neck. He still has pains in the upper back and lower neck. He suffered emotional trauma during the experience and continues to have trauma. He has nightmares that he and fellow inmates are being shot and killed by Angola guards. When he sees more than three or more security offices or tactical team members together, he is frightened. He seeks compensatory and punitive damages as well as injunctive relief.

CLAIMS OF GREGORY WIMBERLY

60. Gregory Wimberly, was kicked in the face, mouth, and ear. He was beaten with batons on the side, thighs, while handcuffed and on his knees facing the hall. He was made to kneel for hours while constantly being taunted and beaten. When he fell from off of his knees, due to exhaustion and pain, twice he was beaten in the stomach and legs. His teeth were broken. He still has headaches from the beatings in his head. He suffers dizziness and has other physical problems. He was refused medical treatment for months before he was allowed to see a doctor. He continues with physical and mental problems from the experience he suffered at the hands of Defendants.

CLAIMS OF EARL LOWE

61. Earl Lowe was beaten while kneeling for hours in the same contorted way as the others, head against the wall, legs and arms crossed and tied behind him with “flex-cuffs” so tight they cut his wrists and ankles, he was beaten repeatedly while on his knees. His eye was blackened,

his lip busted, his left rib cage probably broken, but he received no treatment. He suffered severe bruises to the left and right thighs. He was beaten on the way to Camp "C". When he was housed in Camp "C" dungeon, he along with the others, were made to stay naked in a freezing cold cell with no heat.

He continues to have problems with depression. He has nightmares of many guns with red lights aimed at him. He dreams that men in army uniforms are after him with sticks. He seeks compensatory and punitive damages as well as injunctive relief.

CLAIMS OF JOHN DANIELS

62. John Daniels suffered as the others from beating for hours while forced to kneel in the hall of the Education Building of Camp "D". He was beaten on the head, chest, back, arms, legs, sides. His ankles and wrists are scarred from the deep cuts the flex-cuff made on his wrists and ankles. He was beaten all the way en route to Camp " C". He suffered lock-down for months and months.

He suffered physical and emotional injuries and he seeks compensation for his injuries and the pain he suffered. He seeks injunctive relief as set forth within this complaint. He seeks compensatory and punitive damages as well as injunctive relief.

CLAIMS OF MICHAEL WARDLAW

63. Michael Wardlaw was also made to kneel for hours in the hall. He was beaten on the head, shoulders, ribs, back . He was hit in the face and his right eye was blackened and blood-shot. He has a scar near his right eye from a blow he received in the beatings. His legs, arms, hips, thighs, back and chest were bruised. He was spat on. He along with the others were deprived of

using the bathroom and was forced to urinate on himself causing him great embarrassment. He was on crutches at the time for a severe hamstring pull, yet he was yanked around and made to endure the pain of kneeling for hours. He has scars on his wrists and ankles where the flex cuffs cut into them. He was forced to run with the shackles on his ankles with a ham-string injury. He stood on barefoot concrete with no shoes and with no coat while he waited his turn for interrogation the next morning. He suffered physical and emotional injuries and he seeks compensation for his injuries and the pain he suffered. He seeks compensatory and punitive damages as well as injunctive relief.

## CLAIMS

### FIRST CAUSE OF ACTION - ACCESS TO THE COURTS

64. Plaintiffs incorporate paragraphs 35-63 by reference as though fully set forth herein.

65. All Plaintiffs filed their Disciplinary Appeal and their ARP timely, in that they filed as soon as they had the means to do so. Some filed within the 30 day delay while others were kept without paper or pen and therefore, could not file within the 30 days of the incident. However, as soon as they were allowed paper and pencil, they filed. In both the appeal and the three steps of the grievances, the Administration refused to respond. Further, the Plaintiffs were sent a letter from Warden Kelly Ward of the Dave Wade Correctional Center in Homer, Louisiana, dated April 20, 2000, that informed the Plaintiffs that he would be handling "all appeals rising out of the Hostage Incident of December 28, 1999" and that ARP's were not going to be processed further until "the conclusion of any criminal prosecution resulting from that incident". No action was ever taken on either their appeals or their ARP's. Plaintiffs submit that the letter was a method of preventing Plaintiffs of their constitutional right of access to the court causing them great mental anguish. Plaintiffs seek compensatory damages for such.

## SECOND CAUSE OF ACTION - CRUEL AND UNUSUAL PUNISHMENT

66. Plaintiffs incorporate paragraphs 35-63 by reference as though fully set forth here.

67. The actions of the Defendants, acting under color of state law, deprived Plaintiffs of their rights, privileges, and immunities under the laws of the Constitution of the United States of America, and in particular, their right to be protected against cruel and unusual punishment,

68. By these actions, the Defendants have jointly and severally deprived Plaintiffs of their rights under the Eighth Amendment of the Constitution of the United States and of the Constitution of the State of Louisiana and are in violation of 42 U.S.C. §1983. Plaintiffs seek monetary damages to compensate them for their suffering and punitive damages against each and every defendant found liable for Plaintiffs' suffering. Plaintiffs also seek injunctive relief ordering the Department of Corrections to promulgate rules and procedures, whereby an authority outside of the prison grounds, be required to supervise, and if necessary, intervene to safeguard inmates from excessive force used against them that is unnecessary to restore order within the prison.

## THIRD CAUSE OF ACTION - DEPRIVATION OF DUE PROCESS

69. Plaintiffs incorporate paragraphs 35-63 as though fully set forth herein.

70. The actions of the Defendants under color of State law, deprived Plaintiffs of their due process rights to a fair hearing. Plaintiffs were heard by the same people who attacked, tortured, and beat them, therefore they did not have impartial persons determining the outcome of their case. Secondly, their hearings were merely summary proceedings with no chance to call anyone in their defense nor cross examine their accusers. Further, Plaintiffs did not break any rule or regulation by locking themselves in their "call-out" room of the Education Building until they could be rescued. There was no disciplinary rule or regulation regarding "threat to security" that they violated.

Plaintiffs ask that the Defendants be enjoined to release all inmates still in lockdown who were found to be a "threat to security" merely by their presence in the building when the attempted take over was in progress. Plaintiffs seek to restore all of their privileges and jobs that they enjoyed before the incident occurred, restore their good time, expunge their record from any wrong doing connected with the December 28, 1999 attempted escape or take-over. Further, Plaintiffs seek an injunction ordering the Department of Corrections to promulgate rules and procedures for guidelines for inmates to follow when they find themselves in an inmate hostage take-over situation, or any other situation in which they are present when other inmates are involved in hostile acts against the prison or prison officials.

## FOURTH CAUSE OF ACTION - LACK OF MEDICAL CARE

71. Paragraphs 35-63 are hereby incorporated and set forth herein.

72. The EMTs, who are the gateway to medical care for inmates , refused to respond to any sick-call slip that the Plaintiffs filled out, no matter what their complaint, informing the Plaintiffs that it was useless to fill out sick-call slips because anyone who was in the Education Building the night Captain Knapp was killed was not getting medical attention.

73. By failure to give medical attention to the injured Plaintiffs, the EMT caused further pain and suffering and by the law of Louisiana Civil Code Article 2315, are liable to each of the Plaintiffs for their suffering that could have been alleviated with proper care.

**WHEREFORE,** Plaintiffs pray for the following relief:

a. compensatory and punitive damages against the individual Defendants jointly and severally;

b. an order for the Department of Corrections and the Louisiana State Penitentiary to rescind the finding of guilty to the charge of "threat to security" against all Plaintiffs and all inmates who were found guilty based on the mere fact that were present in the building at the time of the attempted take-over, to restore the record of each inmate so as to clear it of any wrongdoing regarding the December 28, 1999 incident, to restore each inmates' s good time, return their property or compensate for the loss, return their status to privileges they had earned, to give each back his job he had at the time, if possible;

c. an order to the Secretary of the Department of Corrections to promulgate and publish rules and procedures by which inmates are expected to follow if they find themselves in a hostage take-over, or a victim of any kind of inmate uprising, delineating the "do's and do not's" so that the inmates will know what to do;

d. an order to the Secretary of the Department of Corrections to implement sufficient procedures and safeguards that would require some other authority, outside of that of the prison system, to supervise, and if necessary, to intervene in the restoration of order to a prison facility in an attempt by inmates to take-over a part of, or all of the prison. These procedures would bring into check out of control behavior of prison personnel, or any other group sent into a hostile prison situation to restore order, so that the use of excessive force on the innocent inmates present by circumstance and not by choice, as well as prevention of unnecessary force used on the aggressors or initiators of the trouble, can be prevented.

e. costs and reasonable attorney fees;

f. trial by jury;

g. such other and further relief that the court deems just and necessary.

By Attorney for Plaintiffs,

Paula Cobb

Paula Cobb, Bar No. 4214
1211 Carter Avenue
Baton Rouge, Louisiana 70806
Phone: (225) 932-9865
Fax: (225) 927-9333